IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| PEGGY A. BROTHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-3238-CV-S-GAF-SSA |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, *et seq*. Plaintiff's application was denied initially. On February 24, 2005, following two hearings, an administrative law judge (ALJ) issued a decision finding that plaintiff was not under a "disability" as defined in the Act. On May 11, 2005, the Appeals Council of the Social Security Administration denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

The standard of appellate review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *See Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support the Commissioner's conclusion. *See Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence in the record supports the Commissioner's decision, the court may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because the court

would have decided the case differently.  *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).  If, after reviewing the record, the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the Commissioner.  *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000) (citations omitted).

To establish entitlement to benefits based upon disability, a claimant carries the burden of showing that he or she is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 416(l) and 423(d)(1)(A).  The 12-month "duration" requirement applies to a claimant's "inability to engage in any substantial gainful activity," not just to his or her underlying impairment(s).  *See Barnhart v. Walton*, 535 U.S. 212, 217-23 (2002).[1]

On appeal, plaintiff argues that the ALJ did not give adequate weight to the opinion of her treating physician, Dr. Jones, and conversely, gave undue weight to the opinion of a consultative specialist, Dr. Mauldin.  However, the record reflects the ALJ articulated his reasons for rejecting Dr. Jones' opinion, which opinion would restrict plaintiff to less than even sedentary work activities, as being unsupported by the medical evidence and based largely on plaintiff's subjective complaints.  An ALJ "need not give controlling weight to a physician's RFC [residual functional capacity] assessment that is inconsistent with other substantial evidence in the record."  *Strongson v. Barnhart*, 361 F.3d

---

[1] Upon review of the record and applicable authority herein, the defendant's position is found to be controlling.  Much of defendant's brief is adopted without quotation noted.

2

1066, 1070 (8th Cir. 2004) (citing *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (citing *Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir. 1995)). The ALJ also articulated good cause to assign significant weight to the opinion of Dr. Mauldin, who, along with a consultative psychologist, Dr. Anderson, noted evidence that plaintiff exaggerated the severity of her impairments.

While plaintiff argues that the ALJ ignored objective medical evidence, such as x-rays and MRIs, that she contends support Dr. Jones' opinion, the record reflects that evidence was considered by the ALJ and adjudged not to show the existence of a disabling impairment. To summarize the x-ray evidence: in November 1999, a primary care physician, Dr. Crow, noted that right hip x-rays taken in 1998 were normal, although lumbar spine x-rays showed some degenerative changes; in December 1999, an orthopedist, Dr. Walz, noted that x-rays showed degenerative changes associated with osteoarthritis in the right hip; in March 2003, a treatment note from a podiatrist, Dr. Bricker, stated that x-rays showed "severe degenerative changes" in the metatarsal joints of plaintiff's feet; in February 2004, Dr. Jones discussed x-rays that showed "advanced degenerative changes" in the cervical spine; and in a June 2004 letter, plaintiff's chiropractor, Dr. Horton, discussed x-rays [apparently taken sometime after he began treating plaintiff in January 2002] that showed "degenerative changes" in the cervical spine between C-3 and C-7. While the evidence thus shows that plaintiff has degenerative

joint disease, also known as osteoarthritis, that condition is a common, and not necessarily disabling, affliction for an individual of plaintiff's age.[2]

The ALJ also noted that Dr. Jones' opinion was inconsistent with his treatment notes. For example, while Dr. Jones' RFC assessment suggested, among other things, that plaintiff needed to lie down for 20 minutes six times during an 8-hour day, his treatment notes suggested no such restriction. The ALJ may disregard a treating physician's opinion when the opinion is not supported by the physician's own findings and the diagnostic data. *See Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (citations omitted).

Plaintiff criticizes the ALJ's statement that Dr. Jones' RFC assessment indicated she was essentially "bedridden." However, if the limitations Dr. Jones suggested were imposed, plaintiff would indeed have to spend a great deal of the day lying down. In addition to his requirement that she lie down for 20 minutes six times during an eight-hour workday, Dr. Jones also restricted plaintiff to standing and/or walking only 10 minutes and sitting for less than one hour total during that same workday. Thus, plaintiff would be restricted in physical activity approximately sever of eight hours in a workday.

The ALJ also considered that Dr. Jones' opinion was contradicted by the opinion of a specialist in physical medicine and rehabilitation, Dr. Mauldin, whose consultative examination found evidence that plaintiff exaggerated the severity of her impairments. "The Commissioner is encouraged to give

---

[2] Osteoarthritis, also known as degenerative joint disease, is the most frequently occurring form of arthritis. Almost all persons by age 40 have some pathologic changes in weight-bearing joints, although relatively few are symptomatic. By age 70, osteoarthritis is universal. The Merck Manual of Diagnosis and Therapy 1338-42 (16th ed. 1992).

4

more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). An ALJ may properly credit a one-time consultant and discount a treating physician's opinion where the one-time medical assessment is "supported by better or more thorough medical evidence." *Anderson v. Barnhart*, 344 F.3d 809, 812-13 (8th Cir. 2003) (quoting *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).

Dr. Mauldin noted multiple pain complaints with nonorganic signs, and significantly, signs of "dissimulation."[3] Contrary to Dr. Jones' very restrictive RFC assessment, Dr. Mauldin opined that plaintiff was capable of occasionally lifting and/or carrying 50 pounds, and frequently lifting and/or carrying 20 pounds; and standing and/or walking about 6 hours in an 8-hour day with no limitations on sitting or pushing and/or pulling. He also opined that plaintiff was capable of frequent climbing, balancing, kneeling, crouching, crawling, and stooping; and had no manipulative, visual/communicative, or environmental limitations.

In rejecting Dr. Jones' opinion, the ALJ also considered evidence from the consultative examining psychologist, Dr. Anderson, whose psychological testing also indicated that plaintiff exaggerated the severity of her symptoms. In particular, the results plaintiff achieved on the MMPI-2 administered by Dr. Anderson indicated a "fake bad" profile, "suggesting a conscious attempt to look bad, and/or an exaggeration of problem or an over dramatization of problems." Plaintiff's performance

---

[3]"Dissimulation" is defined as: "Concealment of the truth about a situation, especially about a state of health, as by a malingerer." The American Heritage Stedman's Medical Dictionary 234 (2nd ed. 2004).

5

on another test, the Rey's 15 Item Test, was also "not consistent with her education and employment history, and lower than what would be expected given her level of intellectual functioning.

Plaintiff argues further that the ALJ conducted a flawed analysis with respect to her credibility. The record reflects that in evaluating plaintiff's subjective complaints and determining that her testimony was not credible, the ALJ considered the objective medical evidence, e.g., clinical findings, x-rays, and psychological test results, but also considered other factors, including medical opinion evidence and non-medical factors, in compliance with the Commissioner's regulations at 20 C.F.R. § 404.1529(c) (2005), Social Security Ruling (SSR) 96-7p, and the factors for evaluating subjective complaints set forth in *Polaski v. Heckler*, 751 F.2d 943 (8th Cir. 1984). "The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized and considered." *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (citation omitted).

The medical evidence overall contradicts plaintiff's claim of disabling impairments. While plaintiff argues to the contrary, asserting that "changes or increases" in her medication over the years shows that her condition steadily declined, that assertion is not bourne out by the record. To the contrary, many of the treatment records from various physicians note plaintiff's improvement with conservative treatment, albeit with occasional medication changes or dose adjustments.

For example, in March 2000, Dr. Crow noted that Celebrex was "quite effective for her arthritic condition" and that her depression was "responding nicely" to Effexor. In January 2002, when first seen by Dr. Jones, she denied any joint pain. On that occasion she stated that Tranzene was working "fairly well" for her anxiety, although her depression was worsening. Dr. Jones placed her on Celexa and by her next visit, in February 2002, he noted that she was doing okay on Celexa, although

not optimally, at which time he increased the dosage of that medication. By the time of her next visit with Dr. Jones, in March 2002, no problems with depression are mentioned other than fatigue and malaise. During plaintiff's annual exam with Dr. Jones in November 2002, no complaints of any kind are mentioned.

Plaintiff also reportedly responded well to adjustments she received from her chiropractor, Dr. Horton, between January 2002 and July 2003. Dr. Horton reported in June 2004 that "[c]orrection of the vertebral subluxation has been favorable," although he expected plaintiff to continue to have some problems and require continued chiropractic adjustments.

The ALJ also noted that plaintiff reported, in December 2004, that her medications for pain were only over-the-counter analgesics such as Tylenol, Advil, and Aleve. *See Masterson v. Barnhart*, 363 F.3d 731, 739 (8th Cir. 2004) (ALJ properly considered that plaintiff did not take narcotic pain medication in finding her complaint of extreme pain not credible).

While plaintiff states that the ALJ ignored the fact that Dr. Walz "recommended" hip replacement, a more accurate characterization would be that Dr. Walz discussed that option with plaintiff, but saw surgery as something that might be required at some time in the future. In December 1999, Dr. Walz suggested that plaintiff "may need a total hip replacement in the future," but also noted: "However, she is pretty young." Dr. Walz recommended conservative treatment and self-help options, noting in the record: "We have talked about weight loss, the use of a cane and management with anti-inflammatory medicines." In a November 2001 letter to plaintiff, Dr. Walz did not mention surgery. In a letter dated February 24, 2005, Dr. Walz stated that he had discussed treatment options with plaintiff, i.e., continuing anti-inflammatory medications or going ahead with total hip replacement.

7

The clinical examinations from medical doctors contained in the record also do not reveal an individual with disabling physical or mental impairments. For example, on November 18, 1999, Dr. Crow's examination of plaintiff was largely normal except for noting a reduced patellar tendon reflex at the left knee. Plaintiff had no pain in the left leg and no decrease in sensation or muscular activity. Plaintiff's left leg was noted to be longer than the right, but she was wearing shoe inserts for that. Dr. Crow's assessment included "mild" somatic dysfunction in the right hip and pelvis region, and probably osteoarthritis of the right hip.

On December 7, 1999, Dr. Walz's examination was unremarkable except for noting a reduced range of motion and pain on rotation of the right hip, and a left leg that was three centimeters shorter than the right. Range of motion of the left hip was excellent and without pain, and the knees had good range of motion. Plaintiff's deep tendon reflexes were 2/4 and intact, except for an absent knee jerk reflex on the left. Light touch sensation was intact, pulses were 2/4, and strength was 5/5. Straight leg raises were negative bilaterally. X-rays showed degenerative changes associated with osteoarthritis in the right hip joint and systic changes on the acetabulum and some sclerotic changes, but no flattening of the femoral head.

On March 28, 2001, Dr. Crow's examination was again unremarkable except for noting a reduction of the patellar tendon reflex in the left leg, while the right leg had a normal patellar tendon reflex. Dr. Crow's examination notes concluded with the statement: "This lady is quite nervous. She has a lot of health anxiety and spends too much time of [sic] the Internet."

On January 10, 2002, when examined by Dr. Jones for the first time, plaintiff was in no acute distress and denied any joint pain. Her only complaints were worsening depression and difficulty

8

sleeping. On March 22, 2002, when Dr. Jones saw plaintiff for complaints of neck pain, among other things, his examination found her to have a good range of motion of the neck without restriction. Forward bending did not produce Lhermitte's sign[4]. There were no paresthesias, numbness, or radicular pain with range of motion, and only "mild" crepitants were noted. Neurological examination was also unremarkable; cranial nerves were intact, motor strength was +5/5 in the upper extremities; no spasticity was noted; deep tendon reflexes were +2/4 in the upper and lower extremities; and plaintiff's gait was without ataxia. On November 7, 2002, Dr. Jones saw plaintiff for an annual examination. She was again in no acute distress; no complaints were noted, and Dr. Jones' examination was unremarkable.

On July 22, 2003, when Dr. Jones saw plaintiff for a complaint of increasing anxiety, she was in no acute distress, no orthopedic complaints were mentioned, and Dr. Jones' physical examination appears to have been completely normal. On February 2, 2004, Dr. Jones' musculoskeletal examination was unremarkable; plaintiff had a good range of motion with no swelling or crepitus; there were no obvious deformities or edema in her extremities and her peripheral pulses were equal symmetrically.

On November 12, 2004, a consultative physical examination by Dr. Mauldin attributed plaintiff's claimed physical symptoms largely to anxiety and depression, but also noted evidence of "dissimulation." Dr. Mauldin opined that plaintiff was capable of occasionally lifting and/or carrying 50

---

[4] The development of transient electric-like shocks spreading down the body when the patient flexes the head forward; seen mainly in multiple sclerosis, but also in compression and other disorders of the cervical cord. Dorland's Illustrated Medical Dictionary 1642 (29th ed. 2000).

9

pounds, and frequently lifting and/or carrying 20 pounds; and standing and/or walking about six hours in an eight-hour day with no limitations on sitting or pushing and/or pulling. He also opined that plaintiff was capable of frequent climbing, balancing, kneeling, crouching, crawling, and stooping; and had no manipulative, visual/communicative, or environmental limitations.

With respect to plaintiff's mental impairment, on November 1, 2004, Dr. Anderson's psychological examination found plaintiff's speech to be logical and coherent, as well as relevant and goal directed. Plaintiff appeared to be "perhaps mildly depressed," although her affective responses were generally within the normal range. She was adequately oriented to time, place, person, and purpose, and there was no evidence of a thought disorder. She denied suicidal ideation. Memory functions were generally adequate, including remote memory for historical events. Dr. Anderson described the quality of plaintiff's thinking as "very impaired" in her response to questions concerning the meaning of proverbs, where she irritably responded "don't know" in response to all seven proverbs given. Dr. Anderson also noted, however, that plaintiff did not seem to "exert a lot of effort" in that part of the exercise. Plaintiff's abstract-conceptual thinking was adequate, social judgment skills were moderately impaired, and math functions/numerical computation abilities were mildly impaired. Dr. Anderson estimated plaintiff to be functioning in the average to low-average range of intelligence.

As discussed *supra*, Dr. Anderson conducted psychological tests, including the MMPI-2, the results of which indicated a "fake bad" profile, "suggesting a conscious attempt to look bad, and/or an exaggeration of problem or an over dramatization of problems." Plaintiff's performance on another test, the Rey's 15 Item Test, was also "not consistent with her education and employment history, and

lower than what would be expected given her estimated intellectual functioning in the Average to Low Average range." At the conclusion of her examination, Dr. Anderson summarized:

> The claimant presents with a history of having completed high school and cosmetology school. She reported chronic pain along with other physical conditions. She reported longstanding problems with depression and anxiety, being partially controlled with medication. She reportedly consumes alcohol on a fairly daily basis, though the amount of such is unclear. While it is apparent the claimant is experiencing a lot of psychosocial stressors, with the care of her reportedly autistic son and her aging mother, she reportedly functions adequately in her ALD [activities of daily living] and performs activities related to their care. Memory functions were generally adequate, with adequate mental control. She was estimated to be functioning in the Average to Low Average range of intelligence. The MMPI-2 revealed an invalid profile.

Dr. Anderson's Axis I diagnosis was Depressive Disorder NOS [not otherwise specified] with anxious features, R/O [rule out] Alcohol Abuse; and her Axis II diagnosis was Histrionic Personality Traits[5]. Dr. Anderson assigned a Global Assessment of Functioning (GAF) score of 60, which is at the least severe end of the "moderate" scale of psychological impairment[6]. Dr. Anderson also opined that plaintiff could understand, remember, and carry out simple routine or simple repetitive tasks; make simple work related decisions without excessive supervision; respond appropriately to supervision, co-workers, and usual work situations; and deal with routine changes in a simple routine work setting.

In her psychological evaluation report, Dr. Anderson also noted that plaintiff had never been psychiatrically hospitalized, nor had she ever undergone individual psychotherapy, although she had

---

[5] A histrionic personality is marked by, among other things, excessive emotionality and attention-seeking behavior, intolerance of delayed gratification, and rapid shifting and shallow expression of emotions. Dorland's Illustrated Medical Dictionary 1361 (29th ed. 2000).

[6] GAF scores in the 51 to 60 range indicate "moderate" symptoms, while scores in the 61 to 70 range indicate "mild" symptoms. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 32 (American Psychiatric Association, 4th ed. 1994).

11

attended therapy sessions with her autistic son. The Eighth Circuit has noted that the absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in plaintiff's mental capabilities disfavors a finding of disability. *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (citing *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)).

The ALJ adequately addressed all of the major medical points in his decision, including a discussion of evidence from Dr. Crow, Dr. Walz, Dr. Bricker, Dr. Slater, Dr. Jones, Dr. Horton, Dr. Mauldin, and Dr. Anderson. "In denying disability [benefits], the ALJ does not have to discuss every piece of evidence presented, but must develop the record fully and fairly." *Weber v. Apfel*, 164 F.3d 431, 432 (8th Cir. 1999) (quoting *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993) (per curiam)).

In addition to the medical evidence in evaluating plaintiff's credibility, the ALJ properly considered subjective and non-medical factors, including evidence that plaintiff worked, albeit part-time, during the period of her alleged disability. Even work that is not substantial gainful activity may show that the claimant is able to do more work than he or she actually did. *See* 20 C.F.R. § 404.1571 (2005). *See also Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994) (evidence that claimant worked part-time in a wood shop supported ALJ's conclusion that claimant could perform light work).

Plaintiff argues, however, that the ALJ "inaccurately portrayed the record" when he stated that she worked 20 hours a week in part-time employment; and points to her hearing testimony, at Tr. 345, which she contends indicates she worked only 10 to 12 hours a week at part-time jobs. However, in making this observation, the ALJ referred to Exhibit 3-E, a work activity report submitted by plaintiff on May 16, 2003, considering plaintiff's part-time work. According to the information plaintiff submitted in Exhibit 3-E, she began work at the Springfield School District in February 2002 [no

12

ending date is given], and worked, on average, 30 hours per week. Exhibit 3-E also indicates that plaintiff worked at Bruce Odle from January 2001 through October 2001, and worked, on average, 30 hours per week, and worked at Summerfield Greenhouse in November 2001, on average, 20 hours per week.

The ALJ also noted evidence that plaintiff left full-time employment for reasons other than her medical condition, i.e., to find care for her son. The evidence the ALJ referred to is a treatment note from Dr. Crow dated November 18, 1999, which states that plaintiff "has taken a leave of absence from her workplace (Bass Pro) to find help for her son, and now she's going to take six more months of 'leave of absence' for herself." The Eighth Circuit has found it significant when claimants leave work for reasons other than their medical condition. *See, e.g., Weber v. Barnhart*, 348 F.3d 723, 725 (8th Cir. 2003); *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994); *Weikert v. Sullivan*, 977 F.2d 1249, 1254 (8th Cir. 1992).

The ALJ also considered plaintiff's extensive daily activities, noting that in addition to engaging in part-time employment, she managed a household, cared for her disabled son and elderly mother, drove daily, operated her home computer and used the Internet, and, in 2001, applied for certification as a foster parent. The record documents these and many other activities, including housework, laundry, meal preparation, and shopping (with rest breaks).

While plaintiff testified that she had difficulty performing household chores, and that her disabled son and husband helped her with some things, she also testified: "My husband's gone a lot. He's hardly ever home." The Eighth Circuit has found activities similar to plaintiff's to be inconsistent with total disability. *See, e.g., Guilliams v. Barnhart*, 393 F.3d 798, 802-03 (8th Cir. 2005) ("significant" daily

13

activities such as cooking, laundry, and vacuuming were among the inconsistencies supporting the ALJ's decision to discredit the plaintiff's complaints of disabling pain); *Barnett v. Barnhart*, 362 F.3d 1020, 1023 (8th Cir. 2004) (daily activities that included doing laundry, washing dishes, vacuuming, grocery shopping, paying bills, walking for exercise, and attending church were activities consistent with plaintiff's ability to perform past relevant work as a housekeeper or assembly line worker); *Young*, 221 F.3d at 1069 (activities of cooking, cleaning, laundry, shopping, child care, and language studies confirmed the plaintiff's "ability to work on a daily basis in the national economy"); *Craig v. Apfel*, 212 F.3d 433, 435 (8th Cir. 2000) (fact that claimant "continues to engage in many normal daily living activities including driving, shopping, visiting with friends and relatives, and picking up her grandchild" supported finding of ability to work).

Plaintiff also argues that the ALJ "essentially ignored" written statements provided by her husband, mother, and several acquaintances, which she believes corroborates her subjective complaints. Contrary to plaintiff's argument, the ALJ considered this evidence, but assigned it little weight, noting: "This evidence is not from independent or impartial sources, and is outweighed by the other evidence of record discussed *supra*." An ALJ may properly discredit testimony of a plaintiff's witnesses as unreliable where their testimony is motivated in part by their desire that plaintiff receive benefits and is in conflict with the overall evidence in the record. *See Hall v. Chater*, 109 F.3d 1255, 1258 (8th Cir. 1997) (citing *Brown v. Chater*, 87 F.3d 863, 866 (8th Cir. 1996). The Eighth Circuit has upheld an ALJ's discrediting of claimant's witnesses even where no reason was given, where it was evident that the testimony was discredited by the same evidence that discredited claimant's own testimony. *See Lorenzen v. Chater*, 71 F.3d 316 (8th Cir. 1995).

14

Deference to an ALJ's credibility analysis is appropriate where, as here, the ALJ explicitly discredits the claimant and gives good reason for doing so. *See Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001). "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). The ALJ articulated good reason to find plaintiff's testimony less than credible.

WHEREFORE, for the reasons stated herein, the Commissioner's decision is affirmed.

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED: February 9, 2006